IN THE COURT OF
CRIMINAL APPEALS

                                   OF
TEXAS

 

                                                                              

                                                                     AP-74,851



 

 

                                     PATRICK
HENRY MURPHY, JR.,
Appellant

 

                                                                             v.

 

                                                        THE
STATE OF TEXAS

 



                                                          ON
DIRECT APPEAL

FROM CAUSE NO. F01-00328-T IN THE 283RD
DISTRICT COURT

                                                             DALLAS COUNTY



 

 

Price,
J., delivered the opinion of the Court, in which Keller, P.J., and Meyers,
Johnson, Keasler, Hervey, Holcomb, and Cochran,
JJ., joined.  Womack,
J., concurred in the result. 

 

 

                                                                  O
P I N I O N

 








The appellant was convicted in
November 2003 of capital murder.[1]  Pursuant to
the jury=s answers to the special issues set
forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and
2(e), the trial court sentenced the appellant to death.[2] 
Direct appeal to this Court is automatic.[3]
 The appellant raises forty-two points of error.  We will
affirm. 

A. Facts

On December 13, 2000, the appellant
escaped from the Texas Department of Criminal Justice Connally Unit, along with
inmates George Rivas, Larry Harper, Donald Newbury, Randy Halprin, Joseph
Garcia, and Michael Rodriguez.  They stole firearms and ammunition from the
prison and eventually made their way to Irving, Texas, where they planned to
commit the robbery of an Oshman=s Supersports store on Christmas Eve.

On the evening of December 24, 2000,
the group armed themselves with weapons and two-way radios and carried out
their plan.  Rodriguez, Halprin, Garcia, and Newbury entered Oshman=s pretending to be customers, and
they were followed by Rivas and Harper, who were dressed as security guards. 
The appellant stayed behind inside their Suburban in the store parking lot,
acting as a lookout and monitoring the Irving Police Department=s activity on a radio frequency
scanner.








The Oshman=s store was scheduled to close at
6:00 p.m.  At about 5:45 p.m., Rivas and Harper spoke with store managers Wes
Ferris and Tim Moore at the front of the store and stated that they were
investigating a shoplifting ring in the area.  After they showed employees a
photographic lineup and viewed the store=s surveillance videotape, Rivas drew
his gun and announced the robbery.  The rest of the escapees surrounded the
employees with their weapons drawn.  The employees were told to place their
hands on the counter while the escapees searched them.  Ferris testified that
he heard Rivas talking to someone on a two-way radio.  Rivas Aasked if everything was okay outside
and somebody responded saying everything was fine, the police were involved
with an accident on 183.@  

Rivas then made the employees walk
single file to the breakroom at the back of the store, where he ordered them to
face the wall and remain silent.  Rodriguez and Garcia remained in the
breakroom with the employees, while Rivas escorted Ferris back through the
store.  Rivas took a tote bag off the wall on their way to the customer service
area, where he had Ferris open the registers and place the money in the bag. 
He also made Ferris give him the keys to his car, a white Ford Explorer parked
outside.  Rivas took the store surveillance tape from the video room and had
Ferris empty the cash from the office safe into the bag.  They then went to the
gun department, and Ferris gave Newbury the key to unlock the case where the
shotguns and rifles were kept.  Ferris retrieved handguns from a safe, then
they went back to the employee breakroom.  Rivas said that he was going outside
to get the vehicle and directed Rodriguez and Garcia to tie up the employees
and meet him behind the store.  








When Rivas went outside, he
encountered Misty Wright, who had arrived earlier to pick up her boyfriend,
Oshman=s employee Michael Simpson.  Wright
testified that while waiting in her car in the parking lot, she saw the
employees being patted down and walking to the back of the store in a
single-file line.  She became concerned and called her friend Sheila, who
quickly drove to the store, parked her car, and got into Wright=s car with her.  Wright testified
that a man wearing a black hat and a black security jacket exited the store and
walked toward a white Ford Explorer, but started walking in their direction
when he heard Sheila activate her car alarm.  Wright drove away and parked at a
nearby restaurant, and Sheila called 911 on her cell phone.  As they watched
the Oshman=s store and waited for police to arrive, Wright saw the man get into the
Explorer and drive around to the back of the store.      

Inside the store, Ferris heard
someone on the radio telling Rodriguez and Garcia to hurry up and get out of
the store because they Ahad company.@  Michael Simpson testified that he heard, ACome on, we got to go.  We got to
go.  We got company.@  Rodriguez and Garcia quickly left the breakroom and told
the employees not to move for ten minutes. 








Irving Police Officer Aubrey Hawkins
was dispatched to Oshman=s on a suspicious persons call.  He was the first officer to
arrive on the scene.  When he drove around to the loading dock area at the back
of the building, the escapees shot him multiple times.  Rivas and Halprin were
also shot during the incident.  One of the escapees pulled Hawkins out of his
vehicle, and another took his handgun.  As the escapees fled the scene in the
Explorer, they ran over Hawkins and dragged him several feet.  They then drove
to a nearby apartment complex, where they met the appellant and abandoned the
Explorer.  When other officers arrived at Oshman=s, they found Hawkins lying face down
on the ground without a pulse.  The medical examiner testified that Hawkins
suffered eleven gunshot wounds, some of which caused fatal injuries to his
brain, lungs, and aorta, and he had other injuries that were consistent with
being run over and dragged by a vehicle.   








Oshman=s employees identified the escapees
in a photographic lineup, and the Irving police prepared warrants for the seven
suspects and sent the information to law enforcement agencies throughout the
nation.  On December 31, 2000, the escapees checked into the Coachlight Motel
and RV Park in Woodland Park, Colorado, where they lived in their RV for
several weeks and claimed to be traveling missionaries.  They eventually
aroused the suspicions of other people staying at the RV park, who contacted
the Teller County Sheriff=s Department on January 21, 2001.  On January 22, local law
enforcement officers and the FBI apprehended five of the escapees.  When they
surrounded the RV, Halprin surrendered and Harper committed suicide.  Officers
found firearms, cash, ammunition, two-way radios, an emergency frequency guide
and scanners, a smoke grenade, and a security hat inside the RV.  A bag outside
the RV contained gun parts and electronic communication devices.  Rivas,
Rodriguez, and Garcia were captured in their Jeep at an area convenience
store.  Officers searched the Jeep and found firearms, cash, a two-way radio, a
nightvision scope, a police scanner, and police radio frequency lists for
Colorado Springs and Pueblo.

The appellant and Newbury were
apprehended after a standoff with police at a Holiday Inn in Colorado Springs
on January 23.  Officers recovered cash, firearms, ammunition, and ski masks
from their hotel room.  Colorado Springs police officer Matt Harrell testified
that he spoke to the appellant on the telephone during the standoff at the
hotel.  Harrell testified the appellant told him that during the Oshman=s robbery he Awas in a truck with radio contact,
with an AR-15, and he was set up to do damage from behind in a stand-off
situation.@








The appellant gave a written
statement to Irving police officer Randall Johnson admitting his involvement in
the Oshman=s robbery.  He stated that he and the other escapees planned to rob
Oshman=s Ato increase [their] arsenal and to
get rid of the weapons [they] stole from the prison.@  Prior to the robbery, they
determined the layout of the store and the number of employees and decided the
roles each of the escapees would play.  The appellant acted as Abackup and lookout.@  He programmed Irving police
frequencies into a radio scanner and waited in the Suburban in the Oshman=s parking lot.  The Suburban was
loaded with weapons, including A2 357=s with magnums loads, revolvers . . . [an] AR 15 with
approximately 60 rounds of ammunition, and a twelve gauge pump with 10 rounds.@  The escapees communicated with each
other over walkie-talkies, and, once inside, Harper or Rivas radioed the
appellant to let him know Ait was going down.@  They occasionally radioed the
appellant to Asee if all was o.k. out front,@ and the appellant radioed them a few
times to let them know there were some vehicles outside Aapparently waiting on someone.@  After Rivas went outside, got into
an employee vehicle, and drove around the back of the store, the appellant
heard on the scanner, ASuspicious activity at the Oshman[=]s.@  The appellant Agot on the walkie-talkie and [told]
them to abort[;] the police were here.@  He gave them the precise location
of the patrol car and the direction it was traveling.  When the patrol car
drove around to the back of Oshman=s, the appellant radioed, AHe=s coming around the corner, leave,
leave.@  Shortly thereafter, Harper radioed
the appellant and told him to go to the Apickup point.@  The appellant secured the weapons
in the Suburban and drove to the apartment complex where he met the rest of the
escapees.  He stated that if he were pursued by police, his purpose Awas to initiate firefight with the AR
15.@

During the punishment phase, the
State introduced evidence that the appellant had committed the offense of
burglary of a building in February 1984.  He received a six-year probated
sentence for the offense.  In March 1984, he entered the apartment of a woman
he had known in high school, tied her up, held a knife to her, and sexually
assaulted her.  He was convicted of aggravated sexual assault and received a
fifty-year sentence.  The other escapees were also serving sentences for
serious offenses such as aggravated robbery, kidnapping, injury to a child,
murder, capital murder, and sexual assault.  








After the escape an officer at the
Connally Unit searched the appellant=s dormitory cubicle and found a
handwritten note.  The note stated:  AI refuse to abide by the dictations
of a police state, which Texas has surely become.  Today I fire the first shot
of THE NEW REV[O]LUTION.  Long live freedom.  Death to tyranny.@    

After their escape from the Connally
Unit and prior to the Oshman=s robbery, the escapees committed the robbery of a Radio
Shack and an Auto Zone.  An Auto Zone employee testified that he saw Rivas
communicating with someone outside on a two-way radio during the robbery.  The
escapees took the truck of another Auto Zone employee, which police found in
the parking lot of a nearby grocery store.  There was an earpiece for a
handheld radio in the truck bed.  DNA testing of the earpiece revealed a
profile that was consistent with that of the appellant.

Rivas testified at punishment that he
planned the escape and robberies and assigned the appellant the role of Alookout.@  Rivas confirmed that the appellant
stayed outside the Oshman=s in the Suburban with their guns and gear, monitored a
police scanner, and communicated with Rivas on a two-way radio.  The appellant
told him over the radio that there was a suspicious activity call and that the
police were on their way.  After Rivas went outside and drove behind the Oshman=s, the appellant radioed him and told
him that a police car was coming around the corner to the back of the store.  

B. Sufficiency of the Evidence








In points of error nine through
twelve, the appellant argues that the evidence is legally and factually
insufficient to support his conviction for capital murder.  In evaluating the
legal sufficiency of the evidence, we must view the evidence in the light most
favorable to the verdict and determine whether any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt.[4] 
In a factual sufficiency review, we view all of the evidence in a neutral
light, and we will set the verdict aside only if the evidence is so weak that
the verdict is clearly wrong and manifestly unjust, or the contrary evidence is
so strong that the standard of proof beyond a reasonable doubt could not have
been met.[5]  A clearly
wrong and unjust verdict occurs where the jury=s finding is manifestly unjust,
shocks the conscience, or clearly demonstrates bias.[6]
  

The charge authorized the jury to
convict the appellant of capital murder, as a party or a conspirator, under
either of two theories:  (1) the murder of a peace officer acting in the lawful
discharge of an official duty, with knowledge that the victim was a peace
officer; or, (2) murder in the course of committing or attempting to commit
robbery.  Because the trial court=s charge authorized the jury to
convict on alternative theories, the verdict of guilt will be upheld if the
evidence was sufficient on any one of the theories.[7]









The appellant first argues that the
State failed to prove that he knew the victim was a peace officer.  This
argument is refuted by the appellant=s own statement, which says in
pertinent part:

Rivas
got into the vehicle and drove it around to the back of the store.  I heard
Rivas on the radio say let[=]s load it up. 
It was about this time that I seen [sic] the patrol car.  He had entered from
my right.  Immediately I heard on the scanner suspicious activity at the
Oshman[=]s.  I got on the walkie talkie and telling [sic] them
to abort the police were here.  I was on the radio continuously.  I never got
off the radio.  I gave precious [sic] location of the patrol and direction he
was traveling.  He traveled from my right to my left.  He was just cruising. 
He passed the Oshman[=]s store and then picked up speed and went around
back.  I radioed, Ahe=s coming around
the corner, leave, leave.@

 

The appellant next argues that he Adid not anticipate the shooting and
wanted only to be away from the scene.@  In support of his argument, he
points to the testimony of witness Michael Simpson and his own statement. 
Simpson testified that he heard a voice on the radio telling Rodriguez and
Garcia, ACome on, we got to go.  We got to
go.  We got company.@  The appellant said in his statement that he told the
escapees to Aabort@ and to Aleave.@  The appellant, however, also said in his statement:  AMy purpose was to if pursued by the
police I was to initiate firefight with the AR 15.@  The appellant acknowledged in his
statement that he knew the escapees who entered Oshman=s were armed and planned to steal
more guns from the store. 








The evidence viewed in the light most
favorable to the verdict was sufficient for a rational jury to find beyond a
reasonable doubt that the appellant should have anticipated Officer Hawkins=s death.[8] 
The evidence viewed in a neutral light was not so weak that the verdict was
clearly wrong and manifestly unjust, nor was the contrary evidence so strong
that the beyond a reasonable doubt standard could not have been met.  The
evidence was both legally and factually sufficient to convict the appellant of
capital murder.  Points of error nine, ten, eleven, and twelve are overruled.         


In points of error thirteen and
fourteen, the appellant alleges that the evidence is legally and factually
insufficient to support an affirmative answer to the anti-parties special
issue:

Do you find from the evidence beyond
a reasonable doubt that the defendant, PATRICK HENRY MURPHY, JR., did not
actually cause the death of the deceased, Aubrey Hawkins, but intended to kill
the deceased or another or anticipated that a human life would be taken?

The appellant argues that the evidence is insufficient to
show that he anticipated that a human life would be taken.  








The appellant again points to his
written statement and Simpson=s testimony as evidence that he only intended to Aabort@ the robbery and to Aleave@ the scene.  He asserts that his
intentions were confirmed by Rivas=s punishment phase testimony that
minimized the appellant=s involvement in the Oshman=s robbery.  However, Rivas admitted
that he had committed perjury three times in the past, and there were some
discrepancies between his testimony and the appellant=s statement.  Rivas portrayed himself
as the mastermind who planned the prison escape and the robberies, and
described the appellant as merely a Alookout@ during each event.  The appellant
said in his statement that they made a group decision to rob Oshman=s after they Aweighed the pros and cons,@ and that the escapees were Apretty much equal.@  Rivas testified that the appellant
was hesitant about the Oshman=s robbery.  The appellant explained in his statement, AWhat I didn=t like was so many employees,@ and, ABeing familiar to Irving I knew
[police] response was very quick.@  The appellant stated that he was Ato initiate firefight@ with the AR 15 if pursued by police,
but Rivas denied that this was part of the plan and testified that the weapons
were in the Suburban simply because he did not want to leave them in the hotel
room.  The jury was free to take these discrepancies into account and to
believe or disbelieve any portion of Rivas=s testimony based on their evaluation
of his credibility.    

The appellant, by his own admission,
participated in the planning of the Oshman=s robbery, prepared his weapons, and
programmed police frequencies into his radio scanner.  He knew that the
escapees were armed and was uneasy about the large number of Oshman=s employees and the possibility of a
quick police response.  He alerted the escapees when Officer Hawkins arrived
and gave them Hawkins=s precise location as he drove around to the back of the
store.  He believed that he was Ato initiate firefight@ if pursued by police, and thus a
rational jury could find that he anticipated that the other escapees would do
the same.  








The evidence viewed in the light most
favorable to the verdict was sufficient for a rational jury to find beyond a
reasonable doubt that the appellant anticipated that a human life would be
taken.  The evidence viewed in a neutral light was not so weak that the verdict
was clearly wrong and manifestly unjust, nor was the contrary evidence so
strong that the beyond a reasonable doubt standard could not have been met. 
The evidence was both legally and factually sufficient to support the jury=s affirmative answer to the
anti-parties special issue.  Points of error thirteen and fourteen are
overruled.       

C. Challenges for Cause

In points of error one through six,
the appellant alleges that the trial court improperly denied his challenges for
cause against six venire members:  Brad Richards, Don Jones, Louise Marker,
Carol Cunningham, Maribel Willis, and Robert DeRossett.  The appellant alleges
that these venire members were challengeable for cause under Article 35.16
because they were biased either against the appellant or against some phase of
law upon which he was entitled to rely.[9]   

To preserve error for a trial court=s erroneous denial of a challenge for
cause, the appellant must show that:  (1) he asserted a clear and specific
challenge for cause; (2) he used a peremptory challenge on the complained-of
venire member; (3) all of his peremptory challenges were exhausted; (4) his
request for additional strikes was denied; and, (5) an objectionable juror sat
on the jury.[10]  The
appellant has properly preserved error with respect to each of the challenged
venire members.








When the trial
judge errs in overruling a challenge for cause against a venire member, the
defendant is harmed if he uses a peremptory strike to remove the venire member
and thereafter suffers a detriment from the loss of the strike.[11]
 Because the appellant received one additional peremptory challenge, he can
demonstrate harm only by showing that the trial court erroneously denied at
least two of his challenges for cause.[12] 


When reviewing a
trial court=s decision to deny a challenge for cause, we look at
the entire record to determine if there is sufficient evidence to support the
ruling.[13] 
We give great deference to the trial court=s decision because
the trial judge is present to observe the demeanor and tone of voice of the
venire person.[14]
 When a venire member=s answers are vacillating, unclear,
or contradictory, we accord particular deference to the trial court=s decision[15]. 

Brad Richards

The appellant
argues that Richards was biased against him because he was one of the ATexas Seven@ escapees.  He
asserts that Richards Ahad a definite opinion that an accomplice
should not receive the death penalty, but after learning the trial would
involve a member of the >Texas Seven= he completely
reversed his view on an accomplice receiving the death penalty.@








The prosecutor
initially asked Richards his opinion regarding an accomplice receiving the
death penalty in the following exchange:

Q.      Do you think accomplices
should be prosecuted and ultimately receive the death penalty, depending on the
facts, or would you only reserve the death penalty, if it was up to you, for
the actual triggerman?

 

A.      I think it would just
depend on the evidence.  But I would be more inclined to ‑ ‑ I
mean, I guess the circumstance could be, you know, brought down to where say
maybe the getaway driver and the guy that=s holding the money, maybe those three made a pact they are
not going to kill anybody, if something like that were to come out, and he on
his own, did that.  I would probably be more inclined, the guy that was just
bagging the money and getaway driver, you know, maybe not the death penalty for
those.

 

Q.      Okay.

 

A.      That=s not to say I don=t believe in it.  That=s what I put on my questionnaire. 
I think there are circumstances that even accomplices would be associated with
capital, you know, crime, such as you described that they might not be charged
with the death penalty. 

 

Q.      Is it something that you
believe that if it were up to you, we could make you king of Texas or Governor
of Texas, king of Texas, and if you were to decide about our death penalty
laws, would you have a death penalty for an accomplice or would you put it just
for the triggerman, the person that actually caused the death?

 

A.      I think that I would probably be more inclined to
have it for the triggerman.

 

Q.      And would not have it for the accomplices?

 

A.      No.

 








The prosecutor
then asked Richards about his statement on his jury questionnaire that he had
seen the media coverage of the ATexas Seven@ cases.  Richards
stated that he did not follow the cases closely.  The prosecutor asked him if
knowing this was a ATexas Seven@ case would affect
him in any way, and Richards replied, AI don=t think it would.@  The prosecutor again
questioned Richards regarding the death penalty for an accomplice:

Q.      Okay.  Now, let me get back
to this accomplice business.  Saying what you said that if it was up to you,
you probably wouldn=t have the death penalty for an
accomplice.  I will, also, tell you this now, that we=re prosecuting the defendant under
the theory of parties as an accomplice, not the actual triggerman.

 

Knowing how you feel about that, do you think then, you
could ever assess the death penalty to someone who is not the actual
triggerman, but just an accomplice situation?

 

A.      I think I could.  I think
before I answered it, it would just depend on the circumstances and the
evidence that was, you know, provided.

 

*                  *                  *

 

Q.      Okay.  Let me ask you,
then, if it gets down to it, you do feel, then, in the prosecution of someone
who is not the actual triggerman, a party to the offense, an accomplice to the
offense, that you could, if the evidence showed you, sentence him to death, even
though, you know, he=s not the triggerman?

 

A.      Yes.

 








Defense counsel
complained to the trial court that Richards Aflipflopped@ on Awhether or not an
accomplice was death worthy@ after learning that the case was one of
the ATexas Seven.@  Contrary to the
appellant=s assertion, Richards did not have Aa definite opinion
that an accomplice should not receive the death penalty,@ and then
completely reverse that opinion after learning that the appellant was a member
of the ATexas Seven.@  Before the
prosecutor brought up the topic of the ATexas Seven,@ Richards
acknowledged that he was Amore inclined@ to reserve the
death penalty for the actual triggerman, but stated that he could sentence an
accomplice to death depending on the circumstances and evidence.  After the
prosecutor brought up the ATexas Seven,@ Richards continued
to state that he could sentence an accomplice to death depending on the
circumstances and evidence.  The trial court did not abuse its discretion in
denying the appellant=s challenge for cause on this basis.      


The appellant also
complains that Richards Aindicated that his moral code of conduct
would be stronger than the Court=s instructions.@  Defense counsel
questioned Richards about this issue during the following exchange: 

Q.      It=s been a while since you filled
this [jury questionnaire] out.  One of the questions was, ADo you agree with the following
statement?@  And the statement was, ARegardless of what the Judge says
the law is, the jury should do what they believe is the right thing.@  And you wrote, you checked the
box that said yes.  And you explained it by saying, AIf I believe strongly that
something is right, I=m going to go with my instincts.@

 

And I just want to explore what you meant by that.

 

A.      And the question was about doing ‑ ‑ 

 

Q.      Basically, was some people
think that or regardless of what the Judge says the law is, in other words,
whatever the law is, jurors should do what they believe is the right thing to
do.

 

A.      Okay.  I must have
misinterpreted that question.  I mean, if I served on the jury and I took an
oath, I would do everything based by the law and not my own personal, you know,
feelings.

 








Upon further
questioning by defense counsel, Richards reiterated that he Amisread@ or Amisinterpreted@ the question, and
that he Awould obey what
the law told him to do.@  Defense counsel explained that Richards= Asole job as a
juror@ was Ato decide whether
the State has proven their case beyond a reasonable doubt,@ and that as a
juror he would take an oath to hold the State to that burden.  Defense counsel
continued to question Richards as follows:

Q.      Now that I have explained
it that way, would you be more concerned about doing what you thought was right
‑ ‑ 

 

A.      No.  I would be more concerned with how the
evidence was presented.

 

Q.      And then after it was
presented, would you still hold the State to their burden and make them prove
their case beyond a reasonable doubt?

 

A.      Yes.

 

Q.      And make them prove those Special Issues?

 

A.      Yes.

 

Defense counsel
argued to the trial court that Richards demonstrated a bias in his answers to
the questionnaire and on voir dire and indicated that Ahis moral code of
conduct would be stronger than the Court=s instructions.@  The trial court
denied his challenge for cause, stating:

Court finds that when Mr. Richards was explaining the law
and had an opportunity to explain his answers he provided on the questionnaire,
on further reflection he had acknowledged to the Court that he understands the
law.  The Court finds this juror to be qualified.

 








The record supports the trial court=s ruling.  The
appellant has failed to meet his burden to show that Richards had a bias or
prejudice that would have substantially impaired his ability to carry out his
oath and instructions in accordance with the law.[16] 


Don Jones

The appellant
argues that Jones was
challengeable for cause because he would place the burden of proof on the
defense to prove that the defendant would not be a future danger.  When he was
first questioned by the prosecutor, Jones acknowledged that he would not
automatically answer the future dangerousness special issue in the affirmative
if the appellant were convicted of capital murder.  He agreed that he would
listen to the punishment evidence and then decide whether the State proved
beyond a reasonable doubt that there was a probability of future
dangerousness.              

When defense
counsel asked Jones if he would automatically be persuaded that the appellant would be a
future danger if he were convicted of capital murder, Jones replied, ANo, I would have to hear the other
facts before I could make that determination.@  Defense counsel continued to
question Jones on the issue.  The appellant relies on the following exchange
between defense counsel and Jones to support his argument on appeal:

Q.        But would you need to hear anything from the
defense, in order to make up your mind about probability?  I mean, would you
need to hear something?

 

A.        Yes,
I would.

 

Q.        Okay. 
Can you elaborate on that?

 








A.        Yeah.  Well, yeah, there again, I would need
to know some background information.

 

Q.        So don=t
let me put words in your mouth, please, because that just makes us stay here
longer.  Would you want to hear from the defendant himself about his background
or his ‑ ‑ 

 

A.        I don=t
think I would have to hear from him, but I would think the defense would want
to give some kind of explanation.

 

Q.        Okay.  Then if you ‑ ‑ keeping
this a hypothetical jury, on this hypothetical jury, after the jury has found
somebody guilty of capital murder and you have either maybe you heard something
from the State or maybe the State has not put anything on, because you can just
consider the crime itself, of course, for that answer.  Some capital murders
will effectively answer the future dangerousness question without too much
problem.  In your mind, you would need to hear from the defense, in order to answer
that question no?

 

A.        Yes.

 

Q.        I
think that=s fair enough.  So you need to hear a little bit from
both sides ‑ ‑ 

 

A.        Right.

 

After defense counsel=s examination of Jones, the trial
court explained to him that the law requires the State to prove the future
dangerousness issue beyond a reasonable doubt, and that A[t]he defense has no burden to put on
any evidence at all.@  Jones indicated that he understood, and the trial court
continued:

THE
COURT:  You said that you understand that concept.  And one of her questions,
would you like to have some evidence from the defendant or would you like to
hear him testify?  You answer was, no, I don=t
have to hear from the defendant, but I might ‑ ‑ I can=t remember the exact word.  I would like to hear from
the defense or I would think you would hear something from the defense before I
could answer that question no.

 








Do
you understand, sir, that they can sit there and do crossword puzzles, they don=t have to present any evidence at all?  It=s the State=s
burden to prove to you beyond a reasonable doubt Special Issue No. 1 and 2.

 

[JONES]: 
Okay.  I guess I misunderstood.

 

THE
COURT:  Now that you understand the law, could you answer Special Issue No. 1
yes or no, depending on the evidence you hear from the State?

 

[JONES]: 
Yes, I could answer that one.

 

When the trial court explained the
law to Jones, he admitted that he had been confused and agreed that he could
follow the law requiring the State to prove the future dangerousness special
issue beyond a reasonable doubt.  The appellant has not shown that Jones had a
bias that would have substantially impaired his ability to carry out his oath
and instructions in accordance with the law.[17]
 

Louise Marker

The appellant
argues that the trial court erred in denying his challenge for cause to Marker
because she would shift the burden of proof to the appellant to disprove the
anti-parties special issue, and she would automatically answer Ayes@ if she found the
appellant guilty of capital murder.  Marker first indicated that she understood the prosecutor=s explanation of the anti-parties
special issue and the State=s burden of proof.  However, when she was questioned by
defense counsel regarding the anti-parties special issue, she expressed
confusion and vacillated in her answers:








Q.        Okay.  And the law ‑ ‑ the law
doesn=t require us to do it.  But what I=m hearing from you is you would need to hear something
from us to answer that question no?

 

A.        If I have already decided he=s guilty, yes, I would have to hear something that
would show that he did not intend.

 

Q.        I hope I haven=t confused you . . . That=s
the law, that we don=t have to.  But in your mind you want to hear from
us.  You are just answering how you really feel about that.  Is that a fair
statement?

 

A.        Well, I mean my understanding, right.  You
don=t have to give anything.  You don=t have to ‑ ‑ from what I understand from
what they said, you absolutely don=t
even have to say a word during the whole thing and they have to prove all of
this.  Well, that would, also, if they could not prove these things, then I
would not answer that question in that direction.

 

Q.        All
right.  And that=s fair.  But then I asked you ‑ ‑ 

 

A.        But if you are going to start, if you are
going to talk, I would expect that you would be supporting what you want me to
know and you would probably bring up something that maybe they didn=t know.  I mean, that=s ‑ ‑ but if you are not going to talk, they are going to
have to prove to me all of these things, answer those things.

 

*                      *                      *

 

Q.        Some people say to us, actually, if I have
already found them guilty of capital murder, I=ve already found, you know, that they should have known that this was
going to happen.  And to me they did anticipate that a human life would be
taken.  I would say yes to that question without even needing to hear anything
else from the State or from the defense.  I=ve
already answered that question yes in my mind when I found him guilty.  Is that
‑ ‑ 

 

A.        That
could happen.

 

Q.        Well
‑ ‑ 

 

A.        I
mean, I don=t know, but that could happen.

 








*          
           *                      *

 

Q.        And it=s
your testimony or answer that you would automatically answer that question yes
if you had found someone, found the defendant guilty of capital murder in the
first part of the trial?

 

A.        That=s what I said, yes.

 

Defense counsel then challenged
Marker for cause because she Aexpressed the inability to follow the scheme and has predecided
Special Issue No. 2,@ and the trial court directed Marker to be brought back for
further questioning.  Marker expressed some confusion in response to defense
counsel=s questions, but indicated an
understanding of the anti-parties special issue and the State=s burden of proof when the trial
court explained it to her: 

THE
COURT:  But anticipated that a human life would be taken, there=s a ‑ ‑ it=s a filter.  There=s a capital
scheme in saying we=re going to reserve the death penalty for those people
who actually caused the death, intended to cause the death, or anticipated that
a human life would be taken.  It=s a
higher burden.  So the law contemplates that simply because you found someone
guilty of capital murder ‑ ‑ and then examples they=re using as an accomplice.

 

[MARKER]: 
Uh‑huh.

 

THE
COURT:  You step back and you answer that question, did their mental state go
to that higher level to impose a death sentence?  It=s a filter.  Does that make some sense?

 

[MARKER]: 
Yeah, that makes a lot of sense.

 

THE
COURT:  Okay.  The parties, is that a decent explanation?  Okay.  Her question
to you is, are you capable of stepping back and reviewing all the evidence,
whether there=s more or not provided to you, and filtering these
facts, whatever the facts may be, to determine whether or not the State has
proven this additional or higher burden of did anticipate that a human life
would be taken?








[MARKER]: 
And you want my answer?  Yes, I could do that.

 

Defense counsel reiterated his
challenge for cause, and the trial court denied it, stating as follows:

You
know, if you let people just talk and she=s
answered to both of the issues of contention here, I told you that an hour
ago.  And her last response is yes, I could consider a life sentence.  And with
what she does on dealing with complex issues on a daily basis, I have a very
good feeling that if she understands the law, if it=s given to her and she has any more than 30 minutes to
deal with it, that she does understand the law and would be able to follow the
law.  She=s just told us that she could consider a life
sentence, even though having found 1 and 2 to be in the affirmative.  She=s gone back and forth.

 

But,
there again, if you get her to back up and understand the program here, I find
that she is capable as exhibited in her own words that she can understand the
law and can follow it.

 

The record supports the trial court=s ruling.  Marker vacillated in her
answers, but ultimately stated that she understood and could follow the law
when the trial court clearly explained it to her.  

Carol Cunningham








The appellant argues that the trial
court should have granted his challenge for cause to Cunningham for several
reasons.  He first alleges that she was biased in favor of the death penalty. 
On direct examination by the prosecutor, Cunningham agreed that she was in
favor of the death penalty for certain crimes and stated that she Abelieve[d] in the death penalty, if
it=s needed.@  She replied in the affirmative when
the prosecutor asked her if she was the type of person that Acould take pen in hand@ and answer the special issues Ain such a way that may lead to the
execution of another human being.@  She explained:  AI just - - I just have strong
convictions about that.  It=s not an opinion that I have, but a conviction.  I think life
is very precious.  But there are consequences to all of our actions and it=s just the way I feel about it.@  She later acknowledged that she
could keep an Aopen mind@ with regard to the special issues, she could consider
evidence of mitigation, and she would not prejudge or automatically answer the
questions based on what she heard during the guilt phase of the trial.  

When examined by defense counsel,
Cunningham initially stated that the death penalty would be her Afirst choice@ for a defendant convicted of capital
murder, but she acknowledged that she Awould have to take into account the
special issues.@  Upon further questioning, she expressed some confusion and
vacillated as to whether she could keep an open mind with regard to the special
issues.  She then stated in response to trial court questioning that she would
listen to the punishment evidence and that she Acould certainly go with life
imprisonment@ if warranted by the facts.  When defense counsel later questioned her
about the mitigation special issue, she stated, AI believe that life imprisonment
needs to be taken into consideration,@ and agreed that she could answer the
question in such a way that would result in a life sentence.








The appellant next alleges that
Cunningham was challengeable for cause because Ashe stated she would consider the
parties to have the same intent based on the actions of the triggerman,@ pointing to Cunningham=s testimony in the following exchange
with the prosecutor:

Q.        And some people we talk to, if it were up to
them, you know, they may feel very strongly in favor of the death penalty for
the triggerman, the guy that pulled the trigger.  But if it was up to them,
they wouldn=t have the death penalty available as an option for
those accomplices.  For whatever reason, religious, moral, or ethical, they
just don=t feel a death sentence would be justified for those
accomplices that didn=t actually take the life.

 

And
some people feel differently, you know.  They would keep that option available
for both the triggerman or the nontriggerman.  Where do you kind of come down
on that issue?

 

A.        Well, I don=t know if this is a valid reason or not, but if you accompany somebody
who does pull the trigger, to me you are equally as capable of doing that, even
though you may not have done it at the time.

 

Q.        Okay.  So, you wouldn=t automatically take the death penalty off the table
for the accomplice, the person that didn=t
actually cause the death.  Is that kind of what I hear you saying?

 

A.        Right,
yes, sir.

 

Upon further questioning by the prosecutor and defense
counsel, Cunningham indicated an understanding of the anti-parties special
issue and stated that she would hold the State to its burden to prove beyond a
reasonable doubt that the appellant anticipated that a human life would be
taken.








Finally, the appellant alleges that
Cunningham was challengeable for cause because she investigated the appellant=s case on the internet.[18] 
Cunningham stated that she looked up the ATexas Seven@ on her computer after she had
appeared in the trial court four months earlier.  Cunningham stated that A[i]t was a one-page thing on the
Internet@ which consisted of Aa little picture of [the appellant]
and a couple of paragraphs.@  She stated:  AAbout the only other thing I remember
about that was it seems like that he had a history of previous offenses, and I
can=t remember what they were.@  When the prosecutor asked her if
what she read would affect her as a juror in the case, she replied: AI don=t think that would have any bearing
on the case.@  When the prosecutor asked her if she could put aside any opinions or
impressions and base her verdict only on the evidence presented at trial, she
responded:  APut it aside?  Yes.@

Defense counsel continued to question
Cunningham on the matter:

Q.        Okay.  Well, and based on what you found out
as part of your curiosity, what opinions have you formed about him before we
even start trial?

 

A.        I
really didn=t, I just didn=t
have any opinions.

 

Q.        Have
you formed the opinion that he has been in lots of trouble before?

 

A.        I
don=t know about lots, but ‑ ‑

 

Q.        But
some?

 

A.        That=s what I read.

 

Q.        Okay.  And before you start the trial, of
course, you know, it=s going to be hard to get that out of your mind.  You=re going to know that going in and you=re going to be thinking that while you=re listening to the evidence.

 








A.        Well, I think, I don=t mean to make a blanket statement, but I think a lot
of people who are guilty of things like that, probably have been involved in
other things in previous, you know, previous years, could have.  So that=s not anything surprising or shocking to me.

 

*                      *                      *

 

Q.        And, you know, it sounds to me like you have
already formed at least some opinion about Mr. Murphy before we=ve even started this case.  Would I be fair in saying
that?

 

A.        I
guess you could say that.

 

Q.        And, of course, you would, you know, it=s kind of hard to unring the bell, once you=ve heard something.  I mean, that would, you=d know that once you were sitting over there in the
trial and it could affect you in some way.  We don=t know now how it could, but it could.  Would that be
fair to say?

 

A.        Yes,
sir.

 

At the conclusion of Cunningham=s voir dire, defense counsel argued
that she had a Aclearly stated bias in favor of the death penalty@ and Ashe would consider the parties to
have the same intent based on the actions of the triggerman.@  The trial court found her to be
qualified, stating that the totality of the examination showed that she
understood and could follow the law.  Defense counsel argued that Cunningham
read about the appellant on the internet and formed an opinion about the facts
of the case and the appellant=s criminal history.  The trial court again found her to be
qualified, stating in pertinent part:

I
believe she was quite honest in her proffer that, hey, after the questionnaire,
I did go look on the Internet and find out his name and recognized his picture
with the beard.  But, you know, I can set that aside.  If she is on the jury,
obviously, I will instruct her, as I have done in the past in writing and
today, that she=s not to look at anything further, from any source or
don=t discuss this case with anyone.  I believe she
understands that.

 








She said
that she could make a decision based on the evidence she hears in open court. 
She is ‑ ‑ once again, once she understood the law she, said, yes,
I could set that aside and base my decision on the evidence I heard in court.

 

The record supports the trial court=s ruling.  Cunningham expressed that
she would require the State to prove beyond a reasonable doubt that the
appellant anticipated that a human life would be taken.  She also demonstrated
that her belief in the death penalty and her knowledge of the appellant=s criminal record would not
substantially impair her ability to carry out her oath and instructions in
accordance with the law.[19]  

Maribel Willis

The appellant asserts that Willis did
not understand the special issues because she told defense counsel she would
assess a life sentence if she had a reasonable doubt about the appellant=s guilt:

Q.        You stated when I asked you what you ‑
‑ whether you would feel comfortable with a life sentence . . . and you
said, well, if I had a doubt about something, I would give life.  Right?  Is
that what you said?

 

A.        Correct.

 

Q.        Okay. 
Would we need to show you anything?

 

A.        No.

 

Q.        Okay. 
What would you need to have a doubt about?

 

A.        Well, if the State didn=t prove something that you are saying that he is
innocent on, that they didn=t prove that he
was guilty, then there=s where the doubt is.








Q.        Okay.  So you would give life instead of
death if he wasn=t proved guilty beyond a reasonable doubt?

 

A.        Correct.

 

Defense counsel then explained that Athe question of death or life is not
in the first part of the trial,@ and that if the appellant was found guilty of capital
murder, then he would receive a life sentence unless the special issues were
answered in a certain way: 

Q.        And then you have to make other
determinations to give them a death                sentence.  And those other
determinations are these Special Issues we=ve
been discussing.  The law says that life is automatic, unless these Special
Issues are answered this way.  I think I hear you saying that your feelings are
that if you wrote the law, the death sentence would be automatic, and it would
have to be proved that the person should get life.  Is that a fair statement?

 

A.        No.

 

Q.        Well,
you wrote in your questionnaire ‑ ‑

 

A.        I know what I answered.  I misunderstood the
question on that.  But the law says that if you find him guilty, you
automatically get a life sentence, but there should be other extenuating
circumstances that should merit ‑ ‑ mete out the death penalty.

 

Q.        Right.

 

A.        Good.

 

Q.        Now, in your heart of hearts do you think
that you can do that and really give him a life sentence, if the State failed
to prove any of these things?

 

A.        If
the State failed to prove, yes.

 

Q.        Okay.  And would you make them prove these
to you beyond a reasonable doubt?

 








A.        Yes.

Defense counsel then questioned
Willis regarding the anti-parties special issue.  Defense counsel asked, AAnd if that person didn=t actually cause the death, what are
you called upon to decide?@  Willis responded, AWhether yes or no, he=s innocent or guilty.@  The trial court clarified that
Willis was Ausing the words innocent or guilty and yes or no interchangeably.@  Upon further questioning, Willis
demonstrated that she understood the anti-parties question and could answer it Ayes@ or Ano.@   

Defense counsel
challenged Willis for cause, arguing that she did not understand the law and Astated
unequivocally that she would give life, if she had a doubt as to whether or not
he was guilty or not.@  The trial court disagreed and found that
Willis did understand the law.  The trial court=s ruling is
supported by the record.  The totality of the voir dire shows that Willis
understood and could follow the law.  

The trial court did not abuse its
discretion in  denying the appellant=s challenges for cause to Richards, Jones,
Marker, Cunningham, and Willis.  Because the appellant has failed to show that
at least two of his complained‑of challenges for cause were erroneously
denied, he cannot show harm on appeal.[20]
  Points of error one through six are overruled.








In point of error
seven, the appellant alleges that he received ineffective assistance of
counsel.  He states: AThis issue is being submitted contingently
on whether this Court for any reason rules that the appellant=s counsel waived
any complaint in the jury selection process; if the Court does not find any
waiver or other attorney error, then this issue is withdrawn.@  As discussed
above, defense counsel preserved error on claims one through six, which we held
to be without merit.  Point of error seven is overruled.

D. Commitment
Question








In point of error
eight, the appellant complains that the trial court allowed the State to ask
venire member J. Robert DeRossett an improper commitment question.[21] 
Commitment questions Acommit a prospective juror to resolve, or
to refrain from resolving, an issue a certain way after learning a particular
fact.@[22]  A commitment
question can be proper or improper, depending on whether the question leads to
a valid challenge for cause.[23]  
Commitment questions are improper when (1) the law does not require a
commitment or (2) when the question adds facts beyond those necessary to
establish a challenge for cause.[24] 
When the law requires certain types of commitments from jurors, attorneys may
ask the prospective jurors whether they can follow the law in that regard.[25] 
The use of a hypothetical fact situation during voir dire is permissible if it
is used Ato explain the
application of the law.@[26]   

During his voir
dire questioning of DeRossett, the prosecutor explained that A[t]he law allows
[the State] to prosecute not only the triggerman for capital murder and
ultimately the death penalty, but also depending on the facts and
circumstances, we could prosecute the accomplice, the nontriggerman.@  When the
prosecutor began to give an illustrative example to show DeRossett Ahow the law works,@ the appellant
objected to the use of Aa specific fact situation.@  The prosecutor
responded that he intended to use a hypothetical Ato explain the
law, not committing him to those facts.@  The trial court
overruled the appellant=s objection and the prosecutor posed the
hypothetical to DeRossett:

I want to talk with you a little bit about the death
penalty and its application to what we call, basically, accomplices, the common
term for people that didn=t actually pull the trigger.  And
let me give you an example to kind of show you how the law works in Texas.

 

Mr. Shook and I agree we=re going to rob a bank.  The plan
is he=s going to go in with a gun.  I=m not going to be armed.  I=m just going to have a bag and
collect the money as he holds up the tellers.  And at some point as we go to do
that, for whatever reason, Mr. Shook shoots and kills the teller.  And we get
the money and get out of there.  And ultimately we get arrested and are brought
back for trial.

 








Mr. Shook, obviously, could be
convicted of capital murder, that intentional murder in the course of a
robbery.  Depending on how, you know, the jury answers the questions, he could
receive the death penalty.  The law also allows for people like me, the
accomplice, the nontriggerman, depending on the facts and circumstances, to
also be prosecuted for capital murder and again, depending on the facts and the
answers to the questions, I could also potentially receive the death penalty.

 

And, again, a lot of people would
draw that line between the shooter and the nonshooter.  What do you think about
that, the death penalty for an accomplice?

 

DeRossett indicated that he understood the
law and could impose the death penalty on an accomplice.  DeRossett also
responded in the affirmative when the prosecutor asked the next question:

I think the way you feel is exactly
what the law contemplates.  There are some people that just wouldn=t consider it, no matter what the
facts and circumstances are.  We just want somebody that can keep an open mind
and follow the law.

 

There are, basically, two different
ways that I can be held responsible.  If you find that I actively encouraged,
directed, solicited, or aided him to commit capital murder, then I could be
found guilty as an accomplice.  Or if you found that we, under the law of
conspiracy, if we agreed or conspired to commit one crime and during that
crime, the bank robbery, Mr. Shook shot and killed the teller and committed
capital murder, if the jury finds that I should have anticipated, if the
accomplice should have anticipated that death, then you can find the accomplice
guilty of capital murder.  Does that make sense to you?

 








The prosecutor=s hypothetical did
not attempt to commit DeRossett to resolve or refrain from resolving an issue
on the basis of particular facts.[27] 
The purpose of the hypothetical was to explain the application of the law to a
capital murder case prosecuted under the law of parties.[28] 
If DeRossett had stated
that he could not find guilt or assess the death penalty for a non-triggerman,
then he would have been challengeable for cause.[29] 
The trial court did not abuse its discretion in allowing the prosecutor to ask
the question.  Point of error eight is overruled.

E. Admission of Oral and Written
Statements

In point of error twenty-four, the
appellant argues that the trial court erred in admitting the oral statements he
made to Colorado Springs police officers during the hotel standoff.  He
complains that these statements Awere the result of de facto custodial
interrogation@ and that the officers failed to warn him as required by Article 38.22.

The appellant filed a pretrial motion
in limine requesting a hearing outside the presence of the jury before the
State attempted to introduce the oral statements.  The trial court heard the
anticipated testimony of Officers Jim Stinson and Matt Harrell and ruled the
evidence admissible over the appellant=s objection.








Stinson testified before the jury
that, when he made initial contact with the appellant on the telephone at the
hotel, he told the appellant that he was with the Colorado Springs police
department, that they were looking for the remaining Texas fugitives, that the
room was surrounded, and that he needed to exit the room with his hands raised
so they could identify him.  The appellant then stated, AWell, Detective, you found us.@  Stinson asked, AWho is this?@ and the appellant responded that he
was APatrick.@  At one point in their conversation,
the appellant asked Stinson if he could Aturn his phone into a speakerphone@ because Ahe needed to keep his hands free.@  When Stinson said he was unable to
fulfill that request, the appellant hung up the phone.  A few minutes later
Stinson called back and the appellant answered the phone.  Stinson asked, AWhat are you doing?  What=s going on?@ and the appellant responded, AWe=re watching porn.@[30]

Harrell testified before the jury
that he later took over the telephone negotiations with the appellant.  Harrell
testified that he did not try to elicit any information about the Oshman=s incident, but that the appellant Abrought it up on his own.@  The appellant told Harrell that Ahe was in a truck with radio contact,
with an AR-15, and he was set up to do damage from behind in a stand-off
situation,@ and that Aduring the Oshman=s [robbery] some people acted in a
wrongful manner and a police officer lost his life.@  In response to defense counsel=s questioning on cross-examination,
Harrell acknowledged that the appellant said he Awouldn=t have done the Oshman=s@ before he said that Asome people acted in a wrongful
manner and a police officer lost his life.@








Article 38.22 applies to statements
taken while a defendant is subject to custodial interrogation.  Nothing in
Article 38.22 precludes the admission of a statement that does not stem from
custodial interrogation or that is the res gestae of the arrest or offense.[31] 
A defendant is in custody if, under the circumstances, a reasonable person
would believe that his freedom of movement was restrained to the degree
associated with a formal arrest.[32]   AInterrogation@ is defined as any words or actions
by the police that they should have known are reasonably likely to elicit an
incriminating response.[33]  

The appellant=s oral statements were not the result
of custodial interrogation.  He made the statements while armed and
unrestrained during a standoff with police.[34] 
The evidence showed that the police did not question the appellant about the
Oshman=s incident; instead, he volunteered
that information during the course of the standoff negotiations.  The trial
court did not abuse its discretion in admitting the statements.  Point of error
twenty-four is overruled.

In point of error fifteen, the
appellant contends that the trial court should have 








suppressed the written statement he gave to Irving police
officer Randall Johnson after he was arrested in Colorado Springs.  He asserts
that he made the statement after the long standoff with police at the hotel,
that he suffered from sleep deprivation and a lack of food, and that he was
inadequately clothed in cold weather.  He argues that his resulting state of
mind and physical condition made him unable to comprehend and voluntarily waive
his Miranda rights.[35]   

An inquiry into the waiver of Miranda
rights Ahas two distinct dimensions.@[36]   First, the waiver must be Avoluntary in the sense that it was
the product of a free and deliberate choice rather than intimidation, coercion,
or deception.@[37]  Second, the waiver must be made Awith a full awareness both of the
nature of the right being abandoned and the consequences of the decision to
abandon it.@[38]  However, the AConstitution does not require that a
criminal suspect know and understand every possible consequence of a waiver of
the Fifth Amendment privilege.@[39]   It is enough that the suspect Aknows that he may choose not to talk
to law enforcement officers, to talk only with counsel present, or to
discontinue talking at any time.@[40]      








Johnson and the appellant both
testified at the hearing on the motion to suppress the appellant=s statement.  The evidence showed
that the hotel standoff began at around 7:00 p.m. on January 23, 2001, and
lasted until approximately 4:00 a.m. on January 24.  The appellant was then
transported to the Colorado Springs Police Department, where he met with
Johnson and another Irving police officer in an interview room.  Johnson read
the appellant his Miranda warnings and the appellant agreed to waive his
rights and give a statement.  Johnson began taking his statement at 4:21 a.m. 
The appellant dictated his statement while Johnson wrote it down, and the
taking of his statement lasted approximately two and one-half hours.  He was
given the opportunity to read and make changes to his statement before signing
it in the presence of a civilian witness.  








The appellant testified that he did
not understand the Miranda warnings, and that he would not have made a
statement if he Ahad a chance to rest or perhaps Miranda had been
explained to [him] in more detail.@  He testified that the hotel
standoff was stressful and that he Ahad been operating on adrenaline@ with Avery little rest@ before he was taken into custody. 
He testified that he had not slept for twenty hours and he was fatigued,
drowsy, and Awould nod out@ at times during the interview.  Johnson testified, however,
that the appellant was awake and alert during the entire interview and he never
looked as if he were about to fall asleep.  Johnson acknowledged that the
appellant was not wearing a shirt, but denied the appellant=s assertion that he was Ashivering@ during the interview.  The appellant
testified that he began crying at one point, but Johnson denied that the
appellant was crying or upset during the interview.  The appellant testified
that he had not eaten for sixteen hours, but he did not remember asking for any
food.  He testified that he received a soft drink and two bathroom breaks, and
that no one ever threatened him or promised him anything in exchange for his
statement.  He acknowledged that he understood his Miranda warnings when
he was arrested on two prior occasions in 1984.  He also acknowledged that he
understood his Miranda warnings when TDCJ investigators later questioned
him after his interview with Johnson, but explained that he had the opportunity
to sleep for a few hours before the TDCJ interview.  He testified that he would
have consulted an attorney before speaking with Johnson if he had had access to
one, but acknowledged that he later agreed to continue talking with TDCJ
investigators without counsel even when they informed him that an attorney was
there for him.         








The trial court found that the
appellant was interviewed shortly after the standoff ended, that it Adefie[d] logic@ that the appellant Awas on an adrenaline rush just an
hour before and no longer able to stay awake during this interview.@  The trial court also found that he
understood his Miranda rights when he was arrested in 1984 and when he
was interviewed by TDCJ investigators following his interview with Johnson;
that he was not threatened, coerced, or promised anything in exchange for his
statement; and that he chose not to consult with counsel during the TDCJ
interview.  The trial court did not abuse its discretion in finding that the
appellant Afreely and voluntarily made an informed decision to waive his rights and
to provide the statement.@  Although the appellant and Johnson gave conflicting
testimony, the trial court was entitled to believe Johnson.[41] 


In the same point of error, the
appellant also claims that Ahis written statement was obtained in violation@ of Article 38.22 and Ahe did not knowingly and
intelligently waive his constitutional right to counsel before giving his
statement when police denied access to [him] by the public defender attorney
assigned to his case and provided for by Colorado statute.@[42]  These arguments are multifarious
and inadequately briefed.  The appellant generally asserts a violation of his Aconstitutional right to counsel,@ but fails to make a clear and
concise argument in support of a Sixth Amendment claim.[43]  
With regard to his Article 38.22 claim, he fails to allege exactly how Article
38.22 was violated.[44]  He
also failed to object to his written statement on the basis of Article 38.22 at
trial.[45]  Point of
error fifteen is overruled. 








            In point of error sixteen, the appellant alleges
that he received ineffective assistance of counsel.  He states that A[t]his issue is being submitted
contingently on whether this Court for any reason denies request to take
judicial notice and/or finds any form of waiver or attorney error in this
issue.@  

To prevail on a claim of ineffective
assistance of counsel, the appellant must show (1) deficient performance and
(2) prejudice.[46]  To show
deficient performance, the appellant must prove by a preponderance of the
evidence that counsel=s representation fell below the standard of professional
norms.[47]  To
demonstrate prejudice, the appellant must show a reasonable probability that,
but for counsel=s unprofessional errors, the result of the proceeding would
have been different.[48]  Judicial
scrutiny of counsel=s performance is highly deferential, and the appellant must
overcome the strong presumption that counsel=s actions were sound trial strategy.[49]  









Counsel failed to object at trial on
the basis of Article 38.22, but the appellant fails to explain on appeal
exactly how Article 38.22 was violated.  The appellant complains that counsel
failed to supplement the record with evidence showing that the admission of his
statement violated his constitutional right to counsel, but he fails to raise a
separate, clear, and concise Aright to counsel@ argument on appeal.  Without more,
he cannot demonstrate deficient performance and prejudice as required by Strickland. 
Point of error sixteen is overruled.

F. Lesser Included Offense








In his seventeenth point of error,
the appellant complains that the trial court erred in refusing to instruct the
jury on the lesser included offense of murder.  We use a two-pronged test to
determine whether a defendant is entitled to an instruction on a lesser
included offense.[50]   The first
step is to determine if the lesser offense is included within the proof
necessary to establish the offense charged.[51] 
The first prong of the test is satisfied here because murder is a lesser
included offense of capital murder.[52]   The
second step is to determine if there is some evidence that would permit the
jury to rationally find that if the defendant is guilty, he is guilty of the
lesser offense but not the greater offense.[53] 
 The jury was authorized to convict the appellant of capital murder, as
a party or a conspirator, under either of two theories:  (1) the intentional or
knowing murder of a peace officer acting in the lawful discharge of an official
duty; or, (2) an intentional murder in the course of committing or attempting
to commit robbery.  The appellant is entitled to a requested lesser included
offense charge if a rational jury, after considering each of the alternative
theories of commission, could convict him only on the lesser included offense.[54] 
            

The appellant argues that he was
entitled to a charge on the lesser included offense of murder because Athere was no evidence of the specific
intent to kill,@ but this was not required because the jury was instructed on
the law of parties.[55]   The
evidence showed that the appellant intended to promote or assist the commission
of the offense or that he should have anticipated Hawkins=s death as a result of carrying out
the conspiracy to commit robbery.  The appellant participated in the planning
and execution of the Oshman=s robbery and alerted the other escapees when Hawkins arrived
in his patrol car and drove around the back of the store.  The evidence would
not permit the jury to rationally find that the appellant was guilty only of
murder.  The appellant has thus failed to meet the second prong of the test.[56] 
Point of error seventeen is overruled.

G. Enmund Objection








In point of error eighteen, the
appellant alleges that his capital murder conviction is unconstitutional under Enmund
v. Florida, a case in which the Supreme Court held that the Eighth
Amendment does not permit imposition of the death penalty on Aone who aids and abets a felony in
the course of which a murder is committed by others but who does not himself
kill, attempt to kill, or intend that a killing take place or that lethal force
will be employed.@[57]  The appellant specifically alleges that A[t]he trial court erred in overruling
[his] objection to the jury charge concerning the applicability of Sec. 7.02(b)
(conspirator liability) of the law of parties as being contrary to the
constitutional requirements of Enmund v. Florida, which requires that
there be specific intent of the accused to kill or to cause the loss of life.@[58]

The appellant=s reliance on Enmund is
misplaced.  Enmund prevents imposition of the death penalty under
certain circumstances; it does not prohibit a capital murder conviction for a
non-triggerman under the law of parties.[59] 
Point of error eighteen is overruled.    

H. Request for Election








In points of error nineteen and
twenty, the appellant argues that the trial court erroneously denied his
request to require the State to elect which theory of capital murder and which
theory of party liability it sought to rely on for conviction.  As discussed
above, the charge authorized the jury to convict the appellant of capital
murder, as a party or a conspirator, under the alternative theories of murder
of a peace officer or murder in the course of committing or attempting to
commit robbery.  The appellant claims that the trial court=s denial of his request for an
election denied him his right to a unanimous jury verdict.

There is no general requirement that
the jury reach agreement on the preliminary factual issues which underlie the
verdict, such as the manner and means by which one offense was committed.[60] 
The appellant was charged with one offense, the capital murder of Aubrey
Hawkins.  The alleged theories of culpability and party liability were merely
alternate methods or means by which the appellant committed one charged
offense.  Points of error nineteen and twenty are overruled.

I. Independent Impulse

In point of error twenty-one, the
appellant claims that the trial court erroneously denied his requested
defensive charge on independent impulse.  Relying upon Mayfield v. State,
he claims that he was entitled to such an instruction because he was charged as
a conspirator and Athe evidence shows that [he] participated in some wrongful
conduct but he did not contemplate the extent of the criminal conduct by his
companions.@[61]  








As we explained in Solomon v.
State, there is no enumerated defense of Aindependent impulse@ in the Penal Code. The appellant=s proposed defensive issue would
simply negate the conspiracy liability element of the State=s case.[62]
  All that is required is for the appropriate portions of the jury charge to
track the language of Section 7.02(b) of the Texas Penal Code.[63]
 Solomon overrules Mayfield to the extent that it holds to the
contrary.[64] 

The jury charge on conspiracy
liability in the instant case properly tracked the language contained in
Section 7.02(b).  Point of error twenty-one is overruled.                        

J. Jury Argument

In point of error twenty-two, the
appellant claims that the trial court erred in overruling his objection to the
prosecutor=s prejudicial closing argument during the guilt phase of the trial.  The
appellant asserts that the prosecutor improperly argued outside the record as
follows:

[PROSECUTOR]: 
[Hawkins] was surrounded and they ambushed him.  They lured him in.  And the
only reason they were able to do that is because of [the appellant].  You can
call him all kinds of things.  He was their lookout, he was their guardian
angel.

 

I=m reminded, you know, this year we=ve had troops over in Iraq fighting and we saw it on
the news all the time.  They talk about the guys that are on the ground.

 

[DEFENSE
COUNSEL]:  I=ll have to object to arguing outside the record.

 

THE
COURT:  Overruled at this time.  Be careful, Mr. Shook.

 








[PROSECUTOR]: 
Air controller, the guys that are out there and can target our bombs.  They put
the laser on the individual, the air, the building, whatever.  And that allows
airplanes to come in, the precision bombing.  That=s what Mr. Murphy is.  He allows them, he lets them
know there=s a police officer here.  He gives them details.  He=s going out front.  He=s coming around back.

 

Generally, permissible jury argument
falls into one of four areas:  (1) summation of the evidence; (2) reasonable
deduction from the evidence; (3) an answer to the argument of opposing counsel;
or (4) a plea for law enforcement.[65]  A
prosecutor has wide latitude in the language and manner of arguing the State=s case consistent with the evidence.[66] 
A prosecutor may also use an analogy to emphasize and explain the evidence.[67]   









The appellant admitted in his
statement that he acted as Abackup and lookout,@ sat outside the Oshman=s store in a Suburban loaded with
weapons, monitored police frequencies on his radio scanner, alerted the
escapees when Hawkins arrived and told them his precise location as he drove
around to the back of the store, and was prepared to Ato initiate firefight@ with the AR 15 if pursued by
police.  Given this evidence, it was not improper for the prosecutor to compare
these actions to a military ambush.  Even if we were to assume error, the
prosecutor=s argument did not affect the appellant=s substantial rights.[68] 
The argument was not extreme or manifestly improper, nor did it inject new and
harmful facts into evidence.[69]   Point of
error twenty-two is overruled.

K. Victim Impact Evidence

In point of error twenty-three, the
appellant complains that the trial court erred during the punishment phase when
it admitted victim impact evidence related to the appellant=s prior conviction for aggravated
sexual assault.  He claims that the admission of this evidence violated his
right to due process under the Fourteenth Amendment and Rules 403 and 404 of
the Texas Rules of Evidence.

Jeannie Grieser, the victim of the
aggravated sexual assault, testified during the punishment phase.  The trial
court held a hearing outside the presence of the jury before allowing Grieser
to testify about how the crime affected her.  Grieser stated that after the
attack she moved from her apartment, had trouble sleeping, had nightmares for
several years, employed extra security measures, and took medication for panic
attacks.  The appellant objected that this was improper victim impact evidence
that was irrelevant and unduly prejudicial.  The trial court ruled the evidence
admissible, but the State never elicited this testimony from Grieser in front
of the jury.  There was no error because the evidence the appellant objected to
was not admitted before the jury.  Point of error twenty-three is overruled.








L. Authentication of Handwritten Note

In point of error twenty-five, the
appellant complains about the admission of State=s Exhibit 1010, the handwritten note
that a Connally Unit officer found in his dormitory cubicle shortly after his
prison escape which stated:  AI refuse to abide by the dictations of a police state, which
Texas has surely become.  Today I fire the first shot of THE NEW REV[O]LUTION. 
Long live freedom.  Death to tyranny.@  The appellant argues that the
exhibit was not properly authenticated as required by Rule 901 of the Texas
Rules of Evidence.[70] 

During the punishment phase, Officer
Rita Samaniego testified at a hearing outside the presence of the jury that she
found the handwritten note in the appellant=s cubicle when she searched the
dormitory where he resided shortly after the prison escape.  She testified that
she was not familiar with the appellant=s handwriting and that approximately
sixty or seventy other inmates were in the dormitory that day.  The trial court
ruled the evidence admissible over the appellant=s Rule 901 objection.  Samaniego then
testified before the jury that she found the note in a box under the cot in the
appellant=s cubicle about thirty minutes after the escape.  The note was admitted
into evidence and the prosecutor read the contents of the note to the jury.








The appellant argues on appeal that
the note was inadmissible because it was found in a dormitory occupied by
multiple inmates, Athere was absolutely no authentication of origin or former
possession through any means,@ and no Ahandwriting or fingerprint analysis@ was performed.  Even if we were to assume
error, the appellant has failed to demonstrate that his substantial rights were
affected by the admission of the note.[71] 
Given the other evidence of the appellant=s prior offenses of burglary of a
building and aggravated sexual assault and his willing participation in a
planned prison escape and multiple robberies thereafter, there is no reasonable
likelihood that the note moved the jury from a state of nonpersuasion to
persuasion regarding the punishment issues.[72] 
Point of error twenty-five is overruled.

M. Texas Death Penalty Statute

The appellant raises numerous
constitutional challenges to Article 37.071 in his 








remaining points of error.  In point of error twenty-six, he
argues that the State should be required to make an affirmative showing that he
is not mentally retarded, citing Atkins v. Virginia.[73] 
In point twenty‑seven, he asserts that the statute violates the Eighth
Amendment because it allows the jury unlimited discretion to impose the death
penalty, citing Justice Blackmun=s dissenting opinion in Callins v.
Collins.[74]  In point
twenty-eight, he asserts that the statute violates the Eighth Amendment as
interpreted in Penry v. Johnson, because Athe mitigation special issue sends
mixed signals to the jury thereby rendering any verdict reached in response to
that special issue intolerable and unreliable.@[75]  In points twenty-nine and thirty,
he complains that the statute violates the state and federal constitutions because
it implicitly puts the burden on the defendant to prove the mitigation special
issue.  In point thirty-one, he argues that the State should instead be
required to prove the absence of sufficient mitigating circumstances beyond a
reasonable doubt.      








In point of error thirty-two, the
appellant claims the statute violates the Eighth and Fourteenth Amendments by
requiring at least ten Ano@ votes for the jury to return a negative answer to the
punishment special issues.  In point thirty-three, he complains of the failure
to define the terms Aprobability,@ Acriminal acts of violence,@ and Acontinuing threat to society@ in the jury instructions.  In points
thirty-four and thirty-five, he argues that the statute violates the state and
federal constitutions Abecause of the impossibility of simultaneously restricting
the jury=s discretion to impose the death
penalty while also allowing the jury unlimited discretion to consider all
evidence militating against imposition of the death penalty.@  In point thirty-six, he claims that
the statute is unconstitutional because it Afails to require the issue of
mitigation be considered by the jury.@  In point thirty-seven, he complains
that the statute fails to place the burden of proof on the State Aregarding aggravating evidence@ in the mitigation special issue.  In
point thirty-eight, the appellant argues that the statutory Penry
special issue violates the Eighth and Fourteenth Amendments because it allows
the type of open‑ended discretion that was condemned in Furman v.
Georgia.[76]  In point
thirty-nine, he contends that the statute is unconstitutional because it Adoes not permit meaningful appellate
review.@  

This Court has previously rejected
all of these claims, and the appellant has given us no reason to revisit these
issues here.[77]  Points of
error twenty-six through thirty-nine are overruled.

In point of error forty, the
appellant claims that the trial court erroneously denied his second motion to
quash the indictment, in which he generally alleged numerous constitutional
challenges to the Texas death penalty scheme.  In his brief on appeal, the
appellant simply re-states the general claims that he alleged in the motion,
without any additional argument or authority in support thereof.  His argument
is both multifarious and inadequately briefed.[78]  
Point of error forty is overruled.








In points of error forty-one and
forty-two, the appellant asserts that Athe cumulative effect of the
above-enumerated constitutional violations@ denied him due process of law under
the Fifth and Fourteenth Amendments to the United States Constitution and due
course of law under Article I, Section 19 of the Texas Constitution.  This
Court has recognized the proposition that a number of errors may be found
harmful in their cumulative effect; however, we have rejected each of the
appellant=s points of error individually.  Without error, there is no cumulative
effect.[79]   Points of
error eighteen and nineteen are overruled. 

We affirm the judgment of the trial
court.

Delivered: April 26, 2006

 

Do Not Publish 









[1]Tex. Penal Code  ' 19.03(a).





[2]Tex. Code Crim. Proc. Art. 37.071, '
2(g).  





[3]Tex. Code Crim. Proc. Art. 37.071, '
2(h)





[4]See Jackson
v. Virginia, 443 U.S. 307, 319 (1979).





[5]Zuniga v. State, 144 S.W.3d 477, 484-85 (Tex. Crim. App. 2004).





[6]Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997).





[7]Rabbani v. State, 847 S.W.2d 555, 558‑59 (Tex. Crim. App. 1992).





[8]TEX. PENAL CODE ' 7.02(b).





[9]Tex. Code Crim. Proc. Art. 35.16(a)(9) and (c)(2). 





[10]Green v. State, 934 S.W.2d 92, 105 (Tex. Crim. App. 1996).





[11]Demouchette v. State, 731 S.W.2d 75, 83 (Tex. Crim. App.
1986).





[12]Chambers v. State, 866 S.W.2d 9, 23 (Tex. Crim. App.
1993).





[13]Feldman v. State, 71 S.W.3d 738, 744 (Tex. Crim. App.
2002).





[14]Ibid.





[15]Ibid.





[16]Feldman, 71 S.W.3d at 744.





[17]Feldman, 71 S.W.3d at 744.





[18] 
The appellant also alleges that his confrontation rights were violated because
he Acould not defend
himself against an unknown article a prospective juror had read,@ but he failed to object on
this basis at trial.  TEX. R. APP. P. 33.1.





[19]Feldman, 71 S.W.3d at 744.





[20]Chambers, 866 S.W.2d at 23. 





[21] 
The State posed its hypothetical to other venire members during jury selection,
but the appellant specifically complains only about the portion of the record
containing the voir dire examination of DeRossett. 





[22]Standefer v. State, 59 S.W.3d 177, 179 (Tex. Crim. App.
2001); Lydia v. State, 109 S.W.3d 495, 498 (Tex. Crim. App. 2003).





[23]Standefer, 59 S.W.3d at 181.





[24]Id. at 181‑182.





[25]Id. at 181.





[26]Atkins v. State, 951 S.W.2d 787, 789 (Tex. Crim.
App. 1997). 





[27]Standefer, 59 S.W.3d at 179.





[28]Atkins, 951 S.W.2d at 789.





[29]Tex. Code Crim. Proc. Art. 35.16(b)(3). Article 35.16(b)(3) provides
that the State may challenge a venire member for cause if Ahe has a bias or prejudice
against any phase of the law upon which the State is entitled to rely for
conviction or punishment.@     






[30]In
the same point of error, the appellant also argues that Athe prejudicial effect outweighed any
probative value@ of
his statements, specifically his Aoral
statement about viewing pornography on television.@  He does not cite Rule 403, nor does he set
out a separate and specific Rule 403 claim.  This portion of his argument is
multifarious and inadequately briefed.  Tex.
R. App. P. 38.1.





[31]Art. 38.22, ' 5.





[32]Stansbury v. California, 511 U.S. 318, 324-26 (1994).





[33]Rhode Island v. Innis, 446 U.S. 291, 302 (1980).





[34]See Hernandez v. State, 819 S.W.2d 806, 815-16 (Tex. Crim. App. 1991) (holding
that statements Hernandez made during a standoff after an attempted jail break
were not the result of custodial interrogation).





[35]
Miranda v. Arizona, 384 U.S. 436 (1966).





[36]Colorado v. Spring, 479 U.S. 564, 573 (1987).





[37]Ibid.





[38]Ibid.





[39]Id. at 574.





[40]Ibid.





[41]See Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (giving
almost total deference to the trial court=s
rulings on questions of historical fact and on application of law to fact
questions that turn upon credibility and demeanor).





[42] 
In support of his claim that a Colorado public defender had been assigned to
his case, the appellant has filed a motion requesting this Court to take
judicial notice of the testimony from the trial of co-defendant Donald Keith
Newberry.  This is unnecessary to our resolution of point of error fifteen. 





[43]TEX. R. APP. P. 38.1(h).





[44]Ibid.





[45]TEX. R. APP. P. 33.1.





[46]Strickland v. Washington, 466 U.S. 668, 687 (1984).





[47]Id. at 688.





[48]Id. at 694.





[49]Id. at 689.





[50]Rousseau v. State, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993).





[51]Ibid.





[52]Feldman, 71
S.W.3d at 750.





[53]Rousseau,
855 S.W.2d at 673.





[54]Feldman, 71
S.W.3d at 752 (citing Arevalo v. State, 970 S.W.2d 547, 548‑49
(Tex. Crim. App. 1998)).





[55]TEX. PENAL CODE '' 7.02(a) and
(b).





[56]Rousseau, 855
S.W.2d at 673.





[57]458 U.S. 782, 797 (1982).





[58] 
The appellant also made an Enmund objection at the punishment phase of
the trial, but in his brief he cites and refers only to his objection at the
guilt or innocence phase.





[59]See Johnson v. State, 853 S.W.2d 527, 535 (Tex. Crim. App. 1992) (holding
that an individual may be found guilty of capital murder based on the law of
parties without violating Enmund).





[60]Schad v. Arizona, 501 U.S. 624, 632 (1991) (plurality opinion); Kitchens v. State, 823
S.W.2d 256, 258 (Tex. Crim. App. 1991).





[61]716 S.W.2d 509 (Tex. Crim. App. 1986)





[62]Solomon v. State, 49 S.W.3d 356, 368 (Tex. Crim. App. 2001).





[63]Ibid.





[64]Ibid.





[65]Cannady v. State, 11 S.W.3d 205, 213 (Tex. Crim. App. 2000).





[66]Holberg v. State, 38 S.W.3d 137, 141 (Tex. Crim. App. 2000).





[67]See Broussard v. State, 910 S.W.2d 952, 959 (Tex. Crim. App. 1995) (upholding
prosecutor=s comparison of the appellant to a volcano when the
evidence showed that the appellant behaved peaceably at times and also had a
great propensity for violence). 





[68]TEX. R. APP. P. 44.2(b).





[69]Shannon v. State, 942 S.W.2d 591, 597 (Tex. Crim. App. 1996).





[70] 
The appellant also argues that the note Aconstituted
the rankest hearsay,@
but he failed to make a hearsay objection to the note at trial.  TEX. R. APP.
P. 33.1.





[71]TEX. R. APP. P. 44.2(b).  





[72]See Jones v. State, 833 S.W.2d 118, 127 (Tex. Crim. App. 1992).  





[73]536 U.S. 304 (2002).





[74]510 U.S. 1141 (1994).





[75]532 U.S. 782 (2001)





[76]408 U.S. 238 (1972).





[77]Escamilla v. State, 143 S.W.3d 814, 878-28 (Tex. Crim. App. 2004), cert. denied, 544
U.S. 950 (2005); Rayford v. State, 125 S.W.3d 521, 532 (Tex. Crim. App.
2003), cert. denied, 543 U.S. 823 (2004); Hughes v. State, 24
S.W.3d 833, 844 (Tex. Crim. App. 2000); Pondexter v. State, 942 S.W.2d
577, 587 (Tex. Crim. App. 1996); Russell v. State, 155 S.W.3d 176, 183
(Tex. Crim. App. 2005).





[78]TEX. R. APP. P. 38.1.





[79]Chamberlain v. State, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999); Wyatt v. State, 23
S.W.3d 18, 30 (Tex. Crim. App. 2000).